## THE S. T. LOVELAND.

(District Court, E. D. Pennsylvania. January 9, 1924.)

No. 37.

Maritime liens ☞30—Libelant held entitled to lien for coal furnished tug at instance of charterer.

Where coal dealer, on being requested to furnish coal to tug, inquired as to its ownership and received affirmative assurance of party's right to bind vessel without knowing that it was chartered, and that charterer had agreed not to place any lien against it, *held*, that furnisher had exercised that degree of diligence required

by Lien Act June 23, 1910, §§ 1–3 (Comp. St. §§ 7783–7785), and was entitled to lien, though he made no examination of documentary title.

In Admiralty. Proceeding by Burns Bros., against the steam tug S. T. Loveland, formerly known as the steam tug Taggart Bros., her engines, etc. Judgment for libelant.

Alexander & Ash, of New York City, and Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (Howard H. Yocum, of Philadelphia, Pa., of counsel), for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa. (Francis C. Adler, of Philadelphia, Pa., of counsel), for respondent.

McKEEHAN, District Judge. This is an action in rem against the steam tug S. T. Loveland, formerly known as the steam tug Taggart Bros., to recover $1,605.25, with interest, for coal and fenders delivered to the tug at Jersey City on various dates between June 7, and July 22, 1919, inclusive. There is no dispute that the coal was delivered, and none as to the reasonableness of its market price, as averred by the libelant.

The sole question in the case is whether the libelant could have ascertained by the exercise of reasonable diligence that, because of the terms of a charter party, the person ordering the coal was without authority to bind the vessel therefor. At the time the coal was furnished, the tug was owned by S. T. Loveland, of Philadelphia. He had bought her in the fall of 1918 from Taggart Bros., of Savannah, Ga., brought her to Philadelphia, and registered her there, changing the name on the boat's stern from "Taggart Bros., Savannah," to "Taggart Bros., Philadelphia." On May 14, 1919, he chartered her to the New Jersey Towing Corporation, a corporation of New York, with offices in New York City, for a term of six months; the charter party providing, inter alia, that the charterer should have no power to create liens upon the tug, and that it would not incur any obligations on the credit of the tug and would promply pay for all supplies furnished her.

On June 2d William Chamberlain, president of the New Jersey Towing Corporation, telephoned from that company's office to Frank L. Burns, first vice president of Burns Bros., who are large coal dealers in New York, and asked for coal for the tug. While there are some discrepancies and differences as to precisely what the conversation was, it is clear that Mr. Burns inquired from Mr. Chamberlain as to the latter's right to bind the tug. Mr. Burns testified:

"Mr. Chamberlain called me up and said he wanted to buy coal for the tug Taggart Bros. I asked him if he owned the tug, and he said he did. Then I said, 'All right; I will sell you the coal, if you will confirm our conversation as to the ownership of the boat.' A few days after my conversation I understood from our marine department that the boat was there to get the coal."

On the same day that the telephone conversation occurred, Chamberlain wrote to Burns Bros. as follows:

"Gentlemen: In accordance with telephone conversation, will you kindly arrange with your coal dock at Communipaw for credit on the tugboat Taggart Bros. She will be at your docks some time this week for coal.

"Very truly yours,

"New Jersey Towing Corporation,

"William Chamberlain, President."

A few days later the tug came to the libelant's pier at Communipaw, and pursuant, apparently, to instructions received from the central office, the libelant's agents at the pier supplied the captain of the tug with the coal he asked for. On 18 different dates between June 7th and July 22d, the tug stopped at the libelant's pier and was loaded with coal at the request of the captain of the tug. Three men were captains of the tug during the period in question, and they ordered and receipted for the coal that is the subject-matter of this claim. The account was kept on the books of the libelant in the name of tug, and the bills were rendered to the New Jersey Towing Corporation.

Lien Act June 23, 1910, §§ 1–3 (Comp. St. §§ 7783–7785), provides that:

"Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"The following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"The officers and agents of a vessel specified in section 2 shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, but nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

It is clear that Burns Bros. believed that the New Jersey Towing Corporation and the tug's captain had the power to bind the tug for supplies furnished to her. It is equally clear that under the terms of the charter party they had no such authority from the owner, but, on the contrary, had agreed not to bind the vessel. Under the statute, however, the libelant has a maritime lien against the tug, unless he knew or by the exercise of reasonable diligence could have ascertained that the parties ordering the coal were without authority to bind the vessel. It seems to me that under the facts of this case Mr. Burns exercised reasonable diligence. He knew Mr. Chamberlain, the president of the New Jersey Towing Corporation, and inquired of him as to the ownership of the tug. Whatever were the exact words he used, it is evident that he made inquiry, and Chamberlain's letter of June 2d substantially confirmed what had been evidently a satisfactory reply to Mr. Burns' inquiry. Mr. Burns might have gone further, of course; he might have pursued the inquiry to an examination of the documentary title to the ship; but the statute does not require the furnisher of supplies to ascertain the fact at his peril. It requires merely reasonable diligence on his part. The tug had been placed by the owner under the control of the charterer, and the furnisher, knowing nothing of the charter, made inquiry from the party in control of the boat as to that party's right to bind the vessel. He received an affirmative assurance, and thereafter for two months supplied coal when and as requested by the then captain of the vessel. I think that upon these facts the libelant fulfilled the measure of diligence required by the law and is entitled to a lien.

Judgment may be entered in favor of the libelant for $1,605.25, with interest; the costs to be borne by the claimant.